D. Maimon Kirschenbaum
Denise Schulman
Leah M. Seliger
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, New York 10004
Tel: (212) 688-5640
Fax: (212) 981-9587

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

**ROXANI AMIRIDIS,**

       **Plaintiff,**

       v.

**THE AIRLINE RESTAURANT CORP., JAMES MESKOURIS and PETER MESKOURIS,**

       **Defendants.**

---------------------------------------------------------x

**CASE NO.:**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Roxani Amiridis alleges as follows:

## JURISDICTION AND VENUE

1. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII"). This Court has supplemental jurisdiction over the New York law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2. Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

1

## PARTIES

3.  Defendant The Airline Restaurant Corp. ("Defendant ARC") is a New York corporation that owns and operates Jackson Hole restaurant (the "Restaurant") located at 69-35 Astoria Boulevard, Queens, New York.

4.  Defendant James Meskouris ("Defendant James") is an owner and operator of Defendant ARC.

5.  Defendant Peter Meskouris ("Defendant Peter") is the son of Defendant James. Defendant Peter has been an owner and operator of Defendant ARC since approximately mid-2018.

6.  All Defendants are collectively referred to herein as the "Defendants."

7.  Defendants have more than 15 employees, and they were Plaintiff's employers under Title VII, the New York State Human Rights Law, and the New York City Human Rights Law.

8.  Plaintiff Roxani Amiridis ("Plaintiff" or "Plaintiff Amiridis") worked for Defendants as a server from September 2016 until March 17, 2020. Plaintiff is a woman.

9.  A true and correct copy of Plaintiff's right to sue issued by the EEOC is attached hereto as Exhibit 1.

## FACTS

10.  Plaintiff began working for Defendants in September 2016 as a server.

11.  In or about mid-2018, Defendant Peter became a co-owner of the Restaurant with Defendant James and Isaac Paschalidis, who is Plaintiff's uncle.

12. Mr. Paschalidis owns a minority share of the Restaurant. As such, Defendant Peter made it clear to Plaintiff's uncle that should he attempt to resist Defendant Peter's decisions, Defendant Peter would "throw [his] cunt niece out of the restaurant."

13. When Defendant Peter became co-owner of the Restaurant, he began coming to the Restaurant every day.

14. Immediately upon becoming a co-owner, Defendant Peter created a sexually charged workplace and began sexually harassing Plaintiff. That sexual harassment continued throughout the remainder of Plaintiff's employment.

15. For example, when Defendant Peter began working at the restaurant, he asked the restaurant manager, a long-time employee of Defendants', questions about when Plaintiff finds time to go out, who she has sex with, and when she does "tsiki tsiki" – referring to sex.

16. Defendant Peter also spoke with his brother, Alex, about Plaintiff's personal life and sex life. Alex later questioned Plaintiff at work about why she could not find a boyfriend.

17. Defendant Peter's sexually harassing comments and gestures quickly became part of the daily environment at the Restaurant.

18. For example, Defendant Peter frequently touched Plaintiff on her waist and butt, and he often walked close behind her and intentionally grazed his body against hers.

19. Defendant Peter also made comments about Plaintiff's and other female servers' bodies and sexual activity on a daily basis.

20. Defendant Peter sexualized female job applicants who sought employment by the Restaurant. Defendant Peter often interviewed female applicants and then commented about their "ass" and "boobs," making clear his criteria for employment.

21. Defendant Peter openly spoke about only wanting to hire young women and no men as servers.

22. Upon information and belief, Defendant Peter even took an applicant in his car with him after she spent the day training in the Restaurant.

23. Once Defendant Peter began coming to the Restaurant, Plaintiff became anxious coming to work each day, dreading the objectification and humiliation she would certainly be subjected to by Defendant Peter.

24. In or about late 2018, Plaintiff complained to Defendant Peter about his behavior. However, Defendant Peter continued to sexually harass Plaintiff and the other female servers.

25. Early in 2019, Defendant Peter said that Plaintiff should "take time off and get laid."

26. In or about the end of 2019, Defendants called their repair man to come to the restaurant to fix a broken counter glass. When the man finished the job, Defendant Peter suggested to Plaintiff that she "take him downstairs for some tsiki tsiki" as a thank you for his work.

27. Defendant Peter often shared with male customers and employees pictures and videos of nude woman with whom Defendant Peter was sexually involved.

28. In fact, in 2019, while Plaintiff and other servers were attending to customers, Defendant Peter displayed a nude picture of a woman to a customer and began boasting out loud that he likes his women "young, just when they become legal. All of you are too old for me." Plaintiff felt immensely awkward trying to take the customer's order while they both listened to Defendant Peter announce his sexual preferences.

29. Later that year, Defendant Peter said to Plaintiff, "If you weren't [Mr. Paschalidis'] niece, I'd do you."

30. Defendant Peter also made it clear that he wanted the female servers to look sexually provocative at work.

31. On one occasion, he ordered Plaintiff to lower the zipper on her sweater so he could see her breasts.

32. On another occasion, brought Plaintiff into the basement of the Restaurant and required her to change into a tighter fitting sweater so her breasts would be more visible.

33. Near the end of 2019, the message board in the restaurant where servers generally wrote the daily specials broke. Plaintiff asked Defendant Peter to purchase a new one for the restaurant. After purchasing the new message board, Defendant Peter said to Plaintiff, "Five hundred dollars [for a message board], and I still don't get laid!", suggesting that Plaintiff should sleep with him to thank him for the new message board.

34. Defendant Peter's vulgar comments weren't just directed at Plaintiff. Defendant Peter also made sexualized comments to other servers in a way that affected Plaintiff, even when he was not talking directly to her.

35. Once, when Plaintiff was standing with two other female servers, Defendant Peter said to them, "I don't last very long. I'm a one-minute man. One minute with you, one minute with you, and one minute with you. It would be three minutes for all of you," implying that he could have sex with all of them in just three minutes.

36. On another occasion, Defendant Peter found himself standing between two female servers, and he said, "Oh, look. Now we're making a sandwich," while grazing his body against their bodies.

37. Early in 2020 a new waitress was hired. Prior to the waitress' first day, Defendant Peter spread the word that she has a "big ass." Once the new waitress began, he said to Plaintiff,

"Oh she's *mavri*. That's why she has a big ass." "Mavri" is a Greek word for a Black person. Defendant Peter then told the new server that she looked just like someone his friend dated, in an effort to hit on her.

38. When Plaintiff heard Defendant Peter subjecting the new server to these comments, she complained to the manager on duty. The manager said that there was nothing he could do because Defendant Peter is the Defendant James's son.

39. In fact, because Defendant Peter is the son of another of the Restaurant's owners, Defendant James, employees are afraid to complain about Defendant Peter's behavior. It was understood among all the employees that Defendant Peter does not have to answer for any of his behavior because Defendant James is his father.

40. Unsurprisingly, Defendants never trained employees regarding the prevention or reporting of sexual harassment or discrimination.

41. Moreover, Defendant James seemed to take pride in his son's sexual exploits both on and off the job, as he often bragged about these conquests.

42. When a customer asked for the phone number of one of Defendants' female servers, in late 2019, Defendant Peter said to her, "I don't know what he sees in you. I mean, you have a nice ass, but that's it." On another occasion, he kicked that waitress on her butt for no reason.

43. In or about 2019, Defendant Peter redecorated the inside of the restaurant. As part of the new décor, Defendant Peter hung a picture of a totally nude Marilyn Monroe in one of the dining areas. Customers, staff and Mr. Paschalidis immediately complained about the utterly inappropriate choice for the family dining venue.

44. Still, Defendant Peter refused to take down the picture. After weeks of complaints from both employees and customers, Defendant Peter moved the nude picture to the highly trafficked hallway near the men's and women's restrooms.

45. The photo still contributed to the overall sexually charged environment in the restaurant. In fact, soon after the picture was moved, one of Plaintiff's customers began talking to her about it and then discussing his sexual habits. Clearly, Defendant Peter's choice of décor offended some people and encouraged others to join in the sexually harassing behavior.

46. Defendant Peter actively encouraged customers to join in his sexually harassing behavior.

47. For example, while Plaintiff and the other servers were working, Defendant Peter told one customer, "If you like her," referring to another waitress, "you can have her for $500."

48. Defendant Peter also made it his regular practice to encourage a known mentally ill customer known as John to stalk and sexually objectify Plaintiff.

49. John came to the Restaurant daily, sat at the counter and stared at Plaintiff throughout her shift. Early in 2019, Plaintiff became aware that John was following her home from work.

50. The first time John interacted with Defendant Peter, John asked if the restaurant sold dildos, adding that he had a prostitute at home who wanted one.

51. Defendant Peter admitted to Plaintiff that he knew, from that first interaction, that John had mental health issues. Defendant Peter also knew that John was stalking Plaintiff and following her home after her shifts.

52. Nevertheless, Defendant Peter often would high-five John, treat him like a good friend and refer to Plaintiff as John's "wifey" in front of him.

53. Defendant Peter knew that Plaintiff feared that John would harm her. For example, even though Plaintiff lives within three blocks of the restaurant, Plaintiff had a family friend drive her home from work every day because John often followed her home.

54. Despite knowing the danger John posed to Plaintiff, Defendant Peter encouraged John's delusions that he was in a romantic relationship with Plaintiff.

55. On one occasion, Defendant Peter told John, "I'm having some trouble today with your wifey." John responded, "Don't worry, I'll take care of her at home," implying he might discipline or harm Plaintiff in her home.

56. On April 10, 2019, John did appear at Plaintiff's home and left a "love" note and a plastic ring in her mailbox.

57. Plaintiff was terrified that John now not only knew where she lived, but that he had also appeared at her home and left a note in which he asked Plaintiff to marry him. The note confirmed his delusion of being in a relationship with Plaintiff.

58. Even after hearing of that incident, Defendant Peter encouraged John to feel comfortable in the restaurant and close to Plaintiff. On July 16, 2019, Defendant Peter invited John to pretend he was working for the Restaurant. He put John behind the cash register and told him to pretend to count money.

59. Plaintiff begged Defendant Peter to stop, but Defendant Peter—knowing full well how terrified Plaintiff was of John—continued the charade and took pictures of John behind the register.

60. In response to Plaintiff's concerns, Defendant Peter suggested to her that she could protect herself by having sex with John after not showering for a week. According to Defendant Peter, after that John would not want to see her again.

61. The same day that Defendant Peter put John behind the register, John again appeared at Plaintiff's home. Plaintiff watched from inside her apartment as John cased her home, clearly assessing its layout and where it had entrances and windows.

62. Plaintiff called the Restaurant manager to come to her apartment and make sure John had left before she felt safe enough to leave her home.

63. Once Plaintiff was sure John left, she reported the incident to the police.

64. The following morning, John appeared at the Restaurant again.

65. While Plaintiff cowered in the back of the Restaurant, waiting for the police to arrive and utterly terrified, Defendant Peter found her and ordered her to stop hiding and start serving tables.

66. After that incident, Plaintiff was able to obtain an order of protection against John.

67. Still, John showed up multiple times at the Restaurant, violating the order of protection and terrifying Plaintiff.

68. In response to Plaintiff obtaining the order of protection, Defendant James commented to Plaintiff that the Restaurant was now losing $2 per day – referring to the $2 coffee that John routinely purchased. Defendant James then asked Plaintiff if she was going to pay Defendants for that loss.

69. On or about March 17, 2020, Defendants closed the Restaurant in response to the spread of COVID-19 in New York.

70. Plaintiff worked at the Restaurant until that closure. Until her last day of work, Defendant Peter's sexual harassment continued. Every day at work, she encountered sexually inappropriate touching, comments and treatment from Defendant Peter, despite her complaints to him about it.

71. By July 2020, nearly all of Defendants' employees were rehired.

72. However, Plaintiff, who had rejected Defendant Peter's advances and reported his harassment against other employees, was one of the few servers not brought back to work once the pandemic-related restrictions were relaxed.

73. Defendants clearly took the approach that female employees, and Plaintiff in particular, must accept Defendant Peter's harassment and advances without complaint if they want to continue working at the Restaurant.

74. As a result of Defendants' discrimination and retaliation, Plaintiff has suffered damages, including severe emotional distress and economic loss.

**FIRST CLAIM FOR RELIEF**
**(Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e, *et seq*. – Discrimination**
**Against Defendant The Airline Restaurant Corp.)**

75. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

76. In violation of Title VII, Defendant ARC intentionally discriminated against Plaintiff on the basis of her gender and subjected her to a gender-based hostile work environment.

77. Defendant ARC's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

78. As a result of Defendant ARC's unlawful conduct, Plaintiff is entitled to recover compensatory damages, including but not limited to damages for economic loss and emotional distress; punitive damages; attorneys' fees and costs; and such other and further legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Title VII of the Civil Rights Act of 1964,
### 42 U.S.C. §§ 2000e, *et seq.* – Retaliation
### Against Defendant The Airline Restaurant Corp.)

79. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

80. In violation of Title VII, Defendant ARC retaliated against Plaintiff for opposing and complaining about gender discrimination and sexual harassment.

81. Defendant ARC's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

82. As a result of Defendant ARC's unlawful conduct, Plaintiff is entitled to recover compensatory damages, including but not limited to damages for economic loss and emotional distress; punitive damages; attorneys' fees and costs; and such other and further legal and equitable relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF
### (New York State Human Rights Law ("NYSHRL"),
### N.Y. Exec. L. §§ 290 *et seq.* – Discrimination
### Against All Defendants)

83. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

84. In violation of the NYSHRL, Defendants intentionally discriminated against and/or aided and abetted discrimination against Plaintiff on the basis of her gender.

85. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

86. As a result of Defendants' unlawful conduct, Plaintiff is entitled to recover compensatory damages, including but not limited to damages for lost wages and emotional

distress; punitive damages; post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### (NYSHRL, N.Y. Exec. L. §§ 290 *et seq*. – Retaliation
### Against All Defendants)

87. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

88. In violation of the NYSHRL, Defendants retaliated against and/or aided and abetted retaliation against Plaintiff for complaining about and/or opposing gender discrimination.

89. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

90. As a result of Defendants' unlawful conduct, Plaintiff is entitled to recover compensatory damages, including but not limited to damages for lost wages and emotional distress; punitive damages; post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF
### (New York City Human Rights Law ("NYCHRL")
### N.Y.C. Admin. Code §§ 8-101 *et seq*. – Discrimination
### Against All Defendants)

91. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

92. In violation of the NYCHRL, Defendants discriminated against and/or aided and abetted discrimination against Plaintiff on the basis of her gender and her status as a victim of stalking.

93. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

94. As a result of Defendants' unlawful conduct, Plaintiff is entitled to recover compensatory damages, including but not limited to damages for lost wages and emotional distress; punitive damages; post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

**SIXTH CLAIM FOR RELIEF**
**(NYCHRL, N.Y.C. Admin. Code §§ 8-101 *et seq*. – Retaliation Against All Defendants)**

95. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

96. In violation of the NYCHRL, Defendant retaliated against and/or aided and abetted retaliation against Plaintiff for complaining about and/or opposing gender discrimination and discrimination based on her status as a victim of stalking.

97. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

98. As a result of Defendants' unlawful conduct, Plaintiff is entitled to recover compensatory damages, including but not limited to damages for lost wages and emotional distress; punitive damages; post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. An award of damages, according to proof, including compensatory damages and punitive damages, to be paid by Defendants;

B. Penalties available under applicable laws;

C. Costs of action incurred herein, including expert fees;

D. Attorneys' fees;

E. Pre-judgment and post-judgment interest, as provided by law; and

F. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated: New York, New York
      February 10, 2021

Respectfully submitted,
JOSEPH & KIRSCHENBAUM LLP

By: /s/ Denise A. Schulman
    D. Maimon Kirschenbaum
    Denise Schulman
    Leah M. Seliger
    32 Broadway, Suite 601
    New York, NY 10004
    Tel: (212) 688-5640

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.